FILED
2021 Feb-24  PM 02:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **WILLIAM ALLEN SOUTHARD,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **ANDREW M. SAUL,** | ) | **NO. 2:19-CV-1527-KOB** |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

On June 20, 2016, the claimant, William Allen Southard, protectively filed applications for a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI, alleging disability beginning March 15, 2016 because of a herniated disc in his back, arthritis, chronic gout, and spinal stenosis. The Commissioner denied the claimant's application for disability insurance benefits on September 1, 2016, and the claimant filed a timely request for a hearing before an Administrative Law Judge (ALJ). The ALJ held a hearing on March 28, 2018. (R. 21, 32-62, 66, 71, 76).

The ALJ found that the claimant was not disabled in a decision dated September 4, 2018. The claimant appealed to the Appeals Council, but it denied the claimant's request for review on July 19, 2019.  (R. 1, 2, 18).  Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration.  (R. 1-7, 18-31).

The claimant has exhausted his administrative remedies, and this court has jurisdiction

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES and REMANDS the decision of the Commissioner.

## II.      ISSUE PRESENTED[1]

Whether the ALJ'S erred in evaluating the claimant's subjective allegations regarding the limiting effects and frequency of his gouty arthritis.

## III.      STANDARD OF REVIEW

The court's scope of review is limited to determining (1) whether substantial evidence exists in the record as a whole to support the findings of the Commissioner, and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker* F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

This court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a

---

[1]  The claimant also raised an issue regarding whether the ALJ gave proper weight to the opinion of treating physician Dr. Angelo Gaffo. But because the court will reverse on this issue, the court will not address whether the ALJ gave proper weight to Dr. Gaffo's opinion.

question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgement for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.    LEGAL STANDARD

### *Subjective Pain Testimony*

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant presented "'evidence of an underlying medical condition' and either 'objective medical evidence that confirms the severity of the alleged pain [or other subjective symptoms] arising from that condition' or 'that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain [or other subjective symptoms].'" *Taylor v. Acting Comm'r of Soc. Sec. Admin.*, No. 18-11978, 2019 WL 581548, at *2 (11th Cir. Feb. 13, 2019) (quoting *Dyer*, 395 F.3d at 1210); *see also* 20 C.F.R. § 404.1529; SSR 16-3p.

When evaluating a claimant's subjective symptoms, the ALJ must consider all available evidence, including objective medical evidence and opinions; the claimant's daily activities; the type, dosage, and effectiveness of medications taken to alleviate the symptoms; and factors that precipitate and aggravate the symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p. "Subjective pain

testimony that is supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the claimant complains is itself sufficient to sustain a finding of disability." *Taylor v. Colvin*, No. 2:15-CV-1925-VEH, 2016 WL 6610442, at *4 (N.D. Ala. Nov. 9, 2016) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)) (internal quotations omitted).

If the ALJ decides to discredit the claimant's testimony as to his subjective symptoms, she must "'clearly articulate explicit and adequate reasons' for doing so." *Taylor*, 2019 WL 581548, at *2 (quoting *Dyer*, 395 F.3d at 1210). The ALJ's failure to articulate reasons for discrediting the claimant's testimony is reversible error. *Ellis v. Soc. Sec. Admin., Comm'r*, No. 4:18-cv-00010-SGC, 2019 WL 1776805, at *5 (N.D. Ala. Apr. 23, 2019).

Also, substantial evidence must support the ALJ's findings regarding the limiting effects of the claimant's symptoms. *Meehan v. Comm'r of Soc. Sec.*, No. 18-14924, 2019 WL 2417642, at *3 (11th Cir. Jun. 10, 2019); *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). The ALJ's determination must contain explicit reasons for the weight given to a claimant's individual symptoms, be consistent with and supported by the evidence, and be clearly articulated so the claimant and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. SSR 16-3p.

An ALJ commits reversible error if she improperly relies on incorrect facts in discrediting the claimant's subjective testimony.  *See Black v. Saul*, No. 19-000041-B, 2020 WL 3264048 (S.D. Ala. June 17, 2020) (reversing and remanding the case where the ALJ misstated the evidence used as a basis for her decision); *Musgrove v. Colvin*, Case No. 3:15-cv-1258-J-DNF, 2017 WL 695242 (M.D. Fla. February 22, 2017) (reversing and remanding where the ALJ relied on incorrect facts in assessing the claimant's subjective testimony).

## V.    FACTS

The claimant was fifty-seven old at the time of his alleged onset of disability; he had earned a GED; completed two years of college; and served in the United States Air Force as a senior airman in weapons and munitions. His past work includes work as a bus driver, printer in a printing company, and machine operator.  He claims disability because of a herniated disc in his back, arthritis, chronic gout, and spinal stenosis.

*Physical Impairments*

The claimant's problems with gout date back to February 22, 2013 in the record.  On that date, the claimant sought treatment at the Birmingham VA when he was in town from Washington visiting family.  He complained of severe pain in his right wrist for the prior seven days because of his gout and reported to Dr. Terrance Shaneyfelt that he had a history of gout flare ups in his ankles, toes, and left knee.  The claimant had taken some "leftover colchichine" for his gout and Advil for his pain and used "Tiger balm" for topical relief the prior several days but had no relief.  Dr. Shaneyfelt aspirated the claimant's wrist; gave him a steroid injection in his wrist; and prescribed three days of oral steroids and Naproxen 500 mg.  (R. 394-398).

The claimant returned to the Birmingham VA on February 26, 2013 complaining that, after a few days of relief, his pain returned and extended from his right wrist into his right thumb and right index finger. He described his pain as an 8 out of 10 on the pain scale and said he had taken Colchicine for his gout for a week straight but discontinued it because he began to have diarrhea. Rheumatologist Dr. Angelo L. Gaffo's physical examination of the claimant revealed swelling and tenderness to palpation in his right index finger; lack of grip strength in his right hand; tenderness in his right wrist; and well-preserved range of motion in his wrists.  Dr. Gaffo aspirated the claimant's finger joint and confirmed gout; prescribed a two-week steroid taper; and recommended that the claimant start Allopurinol daily for his gout when he returned to the Seattle VA and continue the Colchicine as needed for gout flare ups.  (R. 380-392).

On April 30, 2013, the claimant returned to the Birmingham VA complaining of elevated blood pressure for the prior few months.  His blood pressure was 137/93 but he reported no urinary symptoms, dizziness, or "gout complaints."  Dr. Shaneyfelt indicated that the claimant's "gout and current medications limit [his] options for BP control"; prescribed 5 mg Amlodipine for his elevated blood pressure; and encouraged the claimant to follow up with the Seattle VA when he returned home. (R. 376-378).

The record is sparse from April 2013 until April 26, 2016, when the claimant sought treatment at Valley Medical Center in Washington for severe neck pain that progressively became worse.  The claimant had two prior anterior cervical operations in mid-2005 and had "good recovery" from those surgeries but now complained of neck pain.  A CT of the claimant's cervical spine revealed  "pain flare ups secondary to C3-C4 disc degeneration/herniation with spinal stenosis and cord impingement without myelopathy," and Dr. Peter Balousek recommended surgery.  (R. 291-294, 301, 415).

At the claimant's pre-surgery appointment on June 29, 2016, his blood pressure was elevated at 146/101; his motor strength was 5/5 except for his right-hand grip that was 4/5; and the records noted the claimant's past problems with gout and hypertension.  Dr. Peter Balousek at Valley Medical Center performed a C3-4 anterior discectomy with decompression of the spinal cord on July 11, 2016 without complications.  (R. 292-304).

At the surgical follow-up on August 17, 2016, x-ray images showed well-positioned surgical fusion components; "slight anterior movement of C2 on C3 in flexion"; no movement between C3 and C7 in either flexion or extension; degenerative changes at C1-C2; and no evidence of surgical hardware complications or failure.  The records for this visit list the claimant's medications as Colchicine for "gout prevention"; Carvedilol for hypertension; and prescription Tylenol for pain.  (R. 400-410).

6

On October 30, 2016, the claimant went to the Birmingham VA Emergency Department requesting a supply of Colchicine for his gout.  The claimant's blood pressure was elevated at 151/98 and nursing triage notes indicated the claimant was referred to the pharmacy for his medication refill.  Although the "entry date" indicates "Oct 30, 2016", the pharmacy notes indicate that the claimant's prescription was "Last Filled: 11/13/16" at "Seattle VA Medical Center" where his prescription says to "take two tablets by mounth once and take one tablet one hour later for gout attacks (enough medication for 10 attacks)."  The pharmacist at the Birmingham VA gave the claimant "3 tablets at this time to prevent [a] lapse in therapy."  (R. 369-370).

The claimant returned to the Birmingham VA Emergency Department on November 28, 2016 complaining of gout in his left hand and leg pain.  His blood pressure was 153/103.  The records from this visit do not indicate any treatment plan.  (R. 367-368).

The claimant moved from Washington to Birmingham, Alabama and went to the Birmingham VA for a primary "new patient" visit on January 6, 2017.  Dr. Nidhi Bansal's notes indicate the claimant's past problems with alcoholism but that he has "been cutting down—now up to 2-3 drinks/day."  His blood pressure at this visit was 126/92, and Dr. Bansal encouraged the claimant "to be compliant with Carvedilo."  For his gout problems, Dr. Bansal encouraged the claimant "to start Allopurinol 100 mg" once per day and then increase it to twice a day if he could tolerate it well; to decrease his alcohol intake; and to continue taking Colchicine and Naproxen as needed.  (R. 354-366).

The claimant returned to the Birmingham VA on April 13, 2017 complaining of a gout flare up in his knees and ankles. The claimant also reported sporadic bouts of nausea with vomiting possibly related to the Allopurinol. Dr. Bansal instructed the claimant to increase his Allopurinol to twice a day for his gout if tolerated well and to increase his water intake.  Dr. Bansal also noted that the claimant continued "to drink significant [amounts]" of alcohol and suffers from depression.  Dr.

Bansal ordered a CT scan with contrast that showed inflammation in his liver likely caused by alcohol use; instructed the claimant to curtail his alcohol intake; and referred him to mental health treatment for his alcoholism.  (R. 338-339, 344-346).

Social Worker Vanessa Huggins conducted a telephone mental health evaluation of the claimant on April 14, 2017. The "Plan & Disposition" section of Ms. Huggins' notes indicate that the claimant was "already receiving needed treatment."  But the records also show that staff at the Birmingham VA attempted to contact the claimant via the telephone on April 17 and 24 to begin the "process necessary to enter treatment."  In a letter dated April 25, 2017, the Birmingham VA gave the claimant the information for "walk in intake" but the claimant did not respond.  (R. 322, 340).

On June 12, 2017, the claimant sought treatment at the Birmingham VA Emergency Department complaining of left shoulder, elbow, and forearm pain from a fall three days prior.  X-rays showed a "nondisplaced fracture of distal left clavicle."   The records from this visit also noted the claimant's history of problems with gout and hypertension.  Dr. Ross Vandernoot ordered a sling for comfort; prescribed Norco and Naproxen for pain; and instructed the claimant to follow up with his primary doctor in two to three days for a referral to orthopedic surgery if necessary.  (R. 306-310, 328-329).

The claimant called the Birmingham VA clinic on September 12, 2017 requesting a refill of Colchicine, Tramadol, and Naproxen because he was "completely out."  He also asked for a nurse to call him back regarding why the pharmacy only gave him nine Colchicine tablets to last him 90 days "when he believes he should be taking more tablets."  Dr. Bansal received notice of the claimant's call on this same date and noted "please explain to [the claimant] that he needs to be taking allopurinol—not refilled since jan—if having exacerbations w gout"; that Colchicine is only for "acute flare ups"; and that the claimant had no prescription for Tramadol.  Monica C. Mincey,

RN attempted to contact the claimant via telephone to relay Dr. Bansal's notes but had to leave a voice message for the claimant.  (R. 590-591).

On October 18, 2017, the claimant went to the Birmingham VA clinic for an evaluation for his severe gout pain in both feet and right knee and to obtain a refill of his Colchicine.  During the visit, the claimant's heart rate was in the "110s to 120s" and his blood pressure was 140/78, so Dr. Kyle Rudemiller sent the claimant to the Emergency Department for further evaluation.  The claimant reported that he stopped taking "Coreg" for his heart one month ago; admitted poor compliance with his blood pressure medications; and said he had "not been eating or drinking well over the last week due to ongoing pain."  His labs were unremarkable.  His prescriptions upon discharge that same day included Allopurinol and Colchicine for his gout; Carvedilol for his heart rate and blood pressure; and Naproxen and Oxycodone for pain.  Dr. Rudemiller instructed the claimant to take all of his medications as prescribed.  (R. 563-589).

The claimant returned to the Birmingham VA for a routine visit on January 4, 2018, complaining of swelling and pain in his right knee and several gout flare-ups "lately."  The claimant stated that he had been compliant with his medications but "would like more colchicine which helps the most."  He also reported continuing to drink alcohol but had reduced his alcohol intake.  X-rays taken of his right knee showed a noncancerous bone growth along his proximal tibia; soft tissue thickening on his prepatellar; a suprapatellar joint lining inflammation; and no infection or erosion of the bone in his knee.  His feet and ankle x-rays showed no acute fractures; flaring or beaking of the anterior talus bone; mild degenerative arthrosis in the joint spaces; mild soft tissue swelling above the ankle; no bony erosions in his ankles; and questionable erosion of his right foot talus bone between the heel bone and the tibia and fibula.

Dr. Bansal prescribed a wheelchair for the claimant's knee pain and difficulty ambulating during a flareup; told the claimant to hydrate well, reduce his alcohol intake, and continue on his

currently prescribed medications; and referred the claimant to rheumatologist Dr. Gaffo.  (R. 467-475, 550-562).

Dr. Gaffo saw the claimant the next day on January 5, 2018 at the Birmingham VA clinic. The claimant reported that the frequency of his gout flare-ups was "once every 3 months; that he was compliant with his medications; and that he drank "2 servings of vodka daily."  Dr. Gaffo's physical examination of the claimant showed that the claimant had intact motor strength except in his right knee; his right knee was swollen and tender to palpation; and probable "chronic synovitis and damage in the [right] knee exacerbated by gout."  Dr. Gaffo removed fluid from the claimant's right knee via a surgical aspiration and injected his right knee with steroid to control inflammation and help with pain.  (R. 530-549).

By January 9, 2018, the claimant continued to have swelling in his right knee and he returned to Dr. Gaffo on January 10.  The claimant reported that he was taking 200 mg daily of Allopurinol "as of last week (previously on 100)" and that he "has not started Colchicine yet because he forgot to pick [it] up."  Repeat x-rays on this date as compared to the January 4 x-rays showed "mild narrowing of the medial femorotibial joint space"; a "large" noncancerous bone growth "again seen along the proximal right tibia"; and "subchondral cyst-like changes/erosive changes of the fourth toe DIP joint and the left foot."  Dr. Gaffo performed another right knee aspiration and injected it with steroids for pain and inflammation.  Dr. Gaffo increased the claimant's prescription for Allopurinol to 300 mg daily; instructed him to avoid alcohol, eat a healthy diet, and exercise regularly; and told him to return to the clinic in six months.  (R. 462-466, 513-527).

The claimant returned to Dr. Bansal for a routine follow-up on March 6, 2018.  Dr. Bansal's notes indicated that the claimant was "doing well" and had "no further gouty flare ups."  But the claimant reported constant "sharp pain to the right knee" at this visit that he rated a four out of ten

on the pain scale.  The claimant reported an episode of blurry vision one month prior, and Dr. Bansal indicated she would schedule the claimant for a carotid doppler and restart him on aspirin. (R. 503-506).

At the request of the claimant, Dr. Bansal wrote a letter "To Whom It May Concern" on March 7, 2018 stating that the claimant "suffers from hypertension, gouty arthropathy with chronic pain in knees and ankles, and alcoholism."  (R. 454).

Dr. Gaffo also wrote a letter on March 16, 2018 at the request of the claimant stating that the claimant has "severe gout, which has led to frequent exacerbations of intense joint pain and swelling"; that the claimant has "required frequent joint injections to relieve intense pain"; that the claimant "is now on treatment in our clinic with medication to control gout and keep his arthritis under control"; and that the claimant's "condition has started to improve" but was severe at its presentation in January 2018.  (R. 455).

*The ALJ Hearing*

The ALJ hearing took place on March 28, 2018. The claimant testified that he lived with his sister and her husband. He arrived at the hearing wearing a sandal on his right foot because it was swollen, and his shoe would not fit.  (R. 38-39, 56).

The claimant testified that he last worked in March 2016 as a bus driver who transported people and luggage.  He quit that job because he "couldn't pass the medical exam" because of his "blood pressure and accelerated heart rate."  He no longer has a CDL to drive a bus "pretty much" because of his "very high" blood pressure.  The claimant stated that the last time he went to the VA, they did not let him leave because of his high heart rate.  (R. 40, 51-52).

At his past work at Wind Solutions in 2013 he did maintenance and repair; climbed up 300 feet to rig up a tower; and worked 12-16-hour days.  The claimant said that work was hard on his legs, ankles, and knees; that his wrists would swell sometimes, and he could not hold onto the

rigging; and that he could not do that job now because of his impairments. He said he could not remember why he quit that job, but he thought it was because it had a "cutoff age" and "they wouldn't allow me to work anymore." When he worked at Genie Metal, he had to lift large pieces of equipment that weighed about 50 pounds. He said that all of his past work was "physically intense." (R. 41-42, 53-55).

He testified that he could no longer work at any job because of the pain caused by his gout arthritis for which he receives treatment at the VA. His current medications included Indomethacin and Colchicine for his gout, Naproxen for his pain, and Carvedilol for his high blood pressure and excessive heartbeat. He said his medications keep his gout at a "manageable level," but that he has gout flare ups "two, maybe three times a month, and they can get pretty bad." When his gout flares up he takes the Colchicine as needed, Naproxen , and over-the-counter Aleve. He said the Colchicine causes diarrhea, which is why he only takes it when needed, and his blood pressure medications "keep me awake." He drinks two alcoholic drinks at night with the Aleve to help him sleep at night. (R. 44-46, 56-57).

The claimant said that at times he is bedridden for long periods of time because of his gout pain. For the six months prior to the hearing, he said he had to lie down for a couple of times a day for a few hours because "it takes pressure off my knees and my ankles and it helps me relax." (R. 46-47).

Because of his impairments, the claimant testified that he cannot be on his feet long; cannot play golf anymore; can do a little yard work before the pain kicks in; can sit for one hour; cannot pick up anything over ten pounds; cannot pick up luggage anymore; can grocery shop and run errands from "time to time"; can drive if his gout "doesn't keep me from driving"; cannot climb stairs well; can stoop or squat but not often; and can grip a coffee cup and turn a doorknob. (R. 48-49).

The claimant testified that he had a prior work accident that shattered the nerves in his left hand, and he can only feel in his left thumb and index finger. He can pick up an ink pen and paper from a table; make something simple to eat; bathe and dress himself without assistance; wash dishes; do laundry; sweep and mop; vacuum if the vacuum cleaner is not too heavy; and make the bed. He does not go to church or to visit family or friends. He spends his day helping his sister with chores "if it's really needed"; helping feed his sister's animals; and reading. (R. 49-51).

Regarding his alcohol intake, the claimant testified that he receives no treatment, therapy, or medications for alcoholism. He said that "compared to the way I used to drink, I drink like a bird anymore because I take maybe one to possibly two drinks a night just so I can sleep." (R. 47-48).

The vocational expert John Long, Jr. identified the claimant's past work as a bus driver, classified as medium, semi-skilled work; a printer, classified as medium, skilled work; a machine operator I, classified as medium, skilled work; and a "wind-generator-electric-power installer," classified as heavy, skilled work.

The ALJ posed a hypothetical question to Mr. Long involving an individual the same age, education, and work experience as the claimant who could lift 50 pounds occasionally and 25 pounds frequently; can sit for 6 hours, can stand for 6 hours; and can "push and pull as much as lift and carry." Mr. Long testified that such an individual could perform the claimant's past work as a bus driver, press operator, and machine operator. (R. 57-59).

In his second hypothetical, the ALJ asked Mr. Long to consider all of the limitations in the first hypothetical and added that the individual could only do simple and routine tasks and could have no more than occasional contact with the general public. Mr. Long stated that individual could not perform the claimant's past work but could work as a hand packer, classified as medium, unskilled work with 2000 jobs in Alabama and 100,000 jobs in the nation; a "stores laborer," classified as medium, unskilled work with 1,000 jobs in Alabama and 100,000 jobs in the nation;

and a motor vehicle assembler, classified as medium, unskilled work with 500 jobs in Alabama and "an excess of 75,000 nationally." (R. 59).

The ALJ added to the second hypothetical that the individual would be off task 20% of the workday. Mr. Long testified that no jobs would be available for that individual because he could not maintain persistence and pace necessary for full-time work. Mr. Long also testified that individual would have no "easily or readily transferable skills to either light or sedentary" work. Mr. Long explained that if the claimant could not return to any of his past work, "there's no transferable skills that would permit him to work in the national economy." (R. 60-61).

*The ALJ Decision*

On September 4, 2018, the ALJ issued a decision finding the claimant "not disabled." First, the ALJ found that the claimant had met the insured status requirements through December 31, 2020 and that the claimant had not engaged in any substantial gainful activity since the alleged onset date of disability on March 15, 2016. (R. 23).

The ALJ found that the claimant had the severe impairments of gouty arthritis and mild cervical spine degenerative disc disease. Regarding the claimant's history of alcohol abuse, the ALJ found that condition non-severe and stated that no evidence exists in the record to show that his past alcohol abuse "presented with greater than minimal limitation of the claimant's ability to work, whether considered singly or in combination." The ALJ acknowledged that doctors have advised the claimant to decrease his alcohol intake to better control his gout but found that the claimant had not "consistently displayed disabling restrictions since the alleged onset date" because of his gout. (R. 23-24).

The ALJ concluded that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of a Listing. She specifically considered Listing 1.04 regarding the claimant's cervical spine disease and found that it did not result in

"sensory or reflex loss, chronic limitation of cervical spine range of motion, or spinal arachnoiditis." She pointed to the claimant's August 17, 2016 cervical spine x-ray that revealed no acute or significant spinal motion changes in flexion or extension after the claimant's surgery. The ALJ noted that the "record, including the hearing testimony, also establishes that the claimant has no impairment of his bilateral upper extremity strength or his ability to effectively perform fine or gross motor functions." (R. 24).

After stating that she carefully considered the entire record, the ALJ found that the claimant has the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c) and 416.967(c). In making this finding, the ALJ said that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found that the claimant's statements regarding the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record."

The ALJ specifically recounted some of the claimant's testimony at the hearing regarding his alleged limitations but found no evidence in the record to support that his gouty arthritis "consistently produced disabling restrictions." The ALJ explained that the "frequency of the claimant's gout flares suggests less than disabling severity." She specifically found that "the claimant testified—and his testimony is confirmed by treatment records—that he experiences gouty fares infrequently, as they present only every three months." (R. 24-25). The ALJ also found that the claimant's gouty arthritis "is generally controlled with medication"; that the claimant's pain was stabilized with medication treatment during his ER visits; that he reported that he was "doing well" generally at the March 6, 2018 visit and had experienced no gouty flares since the January 2018 episode; and that the claimant's January 10, 2018 x-rays of his knees showed no bony erosions and unremarkable soft tissues. (R. 25).

Regarding the claimant's cervical degenerative disc disease, the ALJ found no evidence in the record that this condition caused any disabling pain after his July 11, 2016 spinal surgery. The ALJ noted that the claimant had normal motor strength in all of his extremities during his January 5, 2018 examination and that he could perform both fine and gross motor functions without significant impairment.  (R. 25-26).

The ALJ gave little weight to Dr. Gaffo's March 16, 2018 letter that indicated that the claimant had "severe" gout that "manifested with frequent exacerbations of intense joint pain and swelling."  The ALJ noted that Dr. Gaffo had only had a treatment relationship with the claimant that began two months prior to the letter. And the ALJ found that Dr. Gaffo's opinion was "both internally inconsistent and not consistent with the record when considered as a whole" because the claimant's "gouty arthritis presented with intermittent frequency—every three months—prior to January 2018 and beginning in March 2018."  (R. 26).

The ALJ concluded that the medical record as whole, including the testimony at the hearing, supported the claimant's RFC.  Based on the claimant's age, education, work experience, and RFC, and on the vocational expert's testimony, the ALJ found that claimant could perform his past work as a bus driver, printer, and machine operator.  Thus, the ALJ found that the claimant was not disabled.

## VI.    DISCUSSION

The claimant argues that the ALJ did not properly credit his subjective complaints about the limiting effects of his gouty arthritis. This court agrees specifically regarding the claimant's testimony regarding the frequency of his gouty arthritis flare ups.

The ALJ determined that the claimant's gouty arthritis could reasonably be expected to cause the claimant's alleged symptoms, but the ALJ found that the claimant's subjective allegations regarding the severity, intensity, and limiting effects of his gouty arthritis were inconsistent with

the record. (R. 24).  But substantial evidence in the record does not support the ALJ's reasons for her finding regarding the frequency of the claimant's gouty flares.

One of the main reasons that the ALJ found that the claimant's gouty arthritis was not disabling involved the *infrequency* of the claimant's alleged gouty flare ups.  The ALJ explained that the "frequency of the claimant's gout flares suggests less than disabling severity."  She specifically found that "the claimant *testified—and his testimony is confirmed by treatment records*—that he experiences gouty fares infrequently, as they present *only every three months*." (R. 24-25) (emphasis added).

But the claimant's testimony at the hearing does not support this finding.  The claimant specifically testified under oath that he has gouty flares "two, maybe three times a month, and they can get pretty bad."  The January 5, 2018 VA records do state that the claimant had gouty flares about once every three months, but by the hearing almost three months later on March 28, 2018, the claimant testified specifically that he had gouty flares *two to three times a month*.  The ALJ's statement that the claimant testimony was that he had gouty flares "only every three months" was wrong.

So, the ALJ's finding on the issue of the frequency of the claimant's gouty flares is based on an incorrect fact about what the claimant supposedly testified at the hearing.  The court is unclear if the ALJ misread the hearing transcript.  But the court cannot guess whether the ALJ actually considered what the claimant *in fact* testified to at the hearing—that he was having two to three gouty flares a month.  And the court cannot guess whether the ALJ's correct understanding of the claimant's testimony at the hearing regarding the frequency of his gouty flares would have changed the ALJ's decision.

Because the ALJ's finding regarding the claimant's testimony at the hearing about the frequency of his gouty flares was based on incorrect facts, the court cannot find that substantial

17

evidence supports her decision on this issue.  *See Black v. Saul*, No. 19-000041-B, 2020 WL 3264048 (S.D. Ala. June 17, 2020) (reversing and remanding the case where the ALJ misstated the evidence used as a basis for her decision); *Musgrove v. Colvin*, Case No. 3:15-cv-1258-J-DNF, 2017 WL 695242 (M.D. Fla. February 22, 2017) (reversing and remanding where the ALJ improperly relied on incorrect facts in assessing the claimant's subjective testimony).  And because the frequency of the claimant's gouty flares was a basis for the ALJ's decision, the court finds that the ALJ committed reversible error in relying on an incorrect fact regarding this issue.

     *Other concerns*

     The court is also concerned about the ALJ's finding that the claimant can perform his past work as a bus driver.  The ALJ failed to discuss or even mention in her opinion the claimant's testimony that he no longer has a CDL because he could not pass the medical examination based on his high blood pressure and rapid heart rate.  The court is unclear from the hearing testimony if the claimant actually tried to get a CDL and did not qualify because of his medical conditions; if his CDL was revoked because of his medical conditions; or if the claimant simply thinks he would be unable to obtain a CDL because of his impairments.  On remand, the ALJ should address the claimant's testimony regarding his ability to obtain a CDL to perform his past work as a bus driver.

CONCLUSION

     For the foregoing reasons, the court concludes that substantial evidence does not supports the ALJ's findings.  The decision of the Commissioner should be REVERSED and REMANDED for further proceedings consistent with this opinion.

     **DONE** and **ORDERED** this 24th day of February, 2021.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE